UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| ANICASIA DIAZ, LUDWIG ALONSO, JULIA DeLEON, MARIA GOMEZ, FREDESWINDA MORCIGLIO, MARIOLA TRUSZKOWSKI, and PEDRO QUINONES, | : : : : : : | 17cv8898 |
| | : | MEMORANDUM & ORDER |
| Plaintiffs, | : : | |
| -against- | : : | |
| LOCAL NO. 241, TRANSPORT WORKERS UNION OF AMERICA, UNIVERSITY DIVISION, and COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, | : : : : : | |
| Defendants. | : : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILLIAM H. PAULEY III, Senior United States District Judge:

Seven individuals employed as heavy cleaners by Columbia University—Anicasia

Diaz, Ludwig Alonso, Julia DeLeon, Maria Gomez, Fredeswinda Morciglio, Mariola

Truszkowski, and Pedro Quinones ("Plaintiffs")—bring this hybrid action under § 301 of the

Labor Management Relations Act, 29 U.S.C. § 185 ("hybrid § 301 claim"), against their union,

Local No. 241, Transport Workers Union of America, University Division ("Local 241"), and

Columbia University in the City of New York ("Columbia").  Plaintiffs contend they were

wrongfully denied overtime hours in breach of a collective bargaining agreement between

Columbia and Local 241, and that Local 241 breached its duty of fair representation ("DFR") by

failing to investigate and remedy Columbia's alleged breach.  Columbia moves to dismiss the

action for lack of standing under Article III of the United States Constitution.  In the alternative,

both Local 241 and Columbia move for summary judgment dismissing all claims on the merits.

For the reasons that follow, Plaintiffs' claims are dismissed for lack of standing.

BACKGROUND

Unless otherwise noted, the following facts are undisputed.  Plaintiffs are, or

were, heavy cleaners employed by Columbia and members of Local 241.  (Pls.' Counter

Statement to Local 241's Statement Pursuant to Local Rule 56.1, ECF No. 95 ("Pls.'

Counterstatement to Local 241"), ¶¶ 2, 3, 6, 7, 8 & 11.)  Heavy cleaners' job responsibilities

include operating motorized equipment to strip and wax floors; cleaning bathrooms and kitchens;

washing walls and blackboards; sweeping lobbies, stairwells, sidewalks, steps, and courtyards;

moving furniture and supplies; and removing ice and snow.  (Pls.' Counter Statement to

Columbia's Local Rule 56.1 Statement of Undisputed Material Facts, ECF No. 94 ("Pls.'

Counterstatement to Columbia"), ¶ 4.)

Columbia has employed Diaz, DeLeon, Truszkowski, and Quinones for more than

twenty years.  (Pls.' Counterstatement to Local 241 ¶¶ 3–4, 6, 10 & 11.)  Gomez and Morciglio[1]

were employed by Columbia for more than twenty years until their retirements.  (Pls.'

Counterstatement to Columbia ¶¶ 25, 29, 30–31.)  Finally, while Alonso continues to be

employed by Columbia, he voluntarily withdrew his claims in this case with prejudice after

Defendants moved for summary judgment.  (Pls.' Mem. of Law in Opp'n to Defs.' Mots. for

Summ. J., ECF No. 93 ("Opp'n"), at 1 n.1.)

Local 241 represents certain maintenance and custodial employees at Columbia—

including Plaintiffs.  (Pls.' Counterstatement to Columbia ¶ 8.)  Columbia is a private, not-for-

---

[1]	There is some dispute regarding the date of Morciglio's retirement.  Columbia asserts, and Plaintiffs agree, that Morciglio retired in February 2018.  (See Aff. of Annette Lopes in Supp. of Columbia's Mot. for Summ. J., ECF No. 91 ("Lopes Aff."), ¶ 15.)  Local 241, however, asserts that Morciglio retired in 2017.  Construing this fact in the light most favorable to Plaintiffs, this Court presumes Morciglio retired in 2018.

profit institution of higher learning with its main campus in Morningside Heights.  (Pls.'
Counterstatement to Columbia ¶ 1.)

    At all relevant times, Plaintiffs' employment was governed by a series of
collective bargaining agreements ("CBAs") between Local 241 and Columbia.  Each included an
identical provision regarding the distribution of overtime:

> All overtime assignments will be distributed as equally as possible
> by job classification and seniority on a rotating list and appropriately
> recorded.  Lists will be posted in an area accessible to employees.
> Each appropriate group will decide on the proper administration of
> such lists.

(Pls.' Counterstatement to Local 241 ¶ 12 ("2008–2013 CBA"); ECF No. 114-1 (2013–2016
CBA); Pls.' Counterstatement to Columbia ¶ 56 (2016–2020 CBA).)

    While supervisors at Columbia authorize overtime, overtime hours are distributed
by head cleaners—employees of Columbia designated by Local 241 to, among other things,
distribute overtime to heavy cleaners.  (Pls.' Counterstatement to Local 241 ¶ 79; Opp'n, at 19–
20.)  To be considered for overtime, heavy cleaners are required to sign up on one or more
overtime lists—(1) the area/building list corresponding to a heavy cleaner's regular work
assignment; (2) coat check (for special events on campus); (3) machine room; (4) boiler room;
(5) snow removal; and (6) labor.  (Pls.' Counterstatement to Columbia ¶¶ 64–65.)

    While the CBAs require overtime assignments to be distributed as equally as
possible, natural disparities arise in the number of overtime hours worked by heavy cleaners.
For example, some buildings have fewer overtime opportunities than other buildings.  (Pls.'
Counterstatement to Local 241 ¶ 25.)  To address this disparity, heavy cleaners—including
Plaintiffs—are permitted to sign up for other overtime lists in order to access more overtime.
(Pls.' Counterstatement to Local 241 ¶ 25.)  That said, heavy cleaners—including Plaintiffs—
sometimes opt out of certain overtime lists.  (See, e.g., Pls.' Counterstatement to Columbia

¶¶ 64, 74 (admitting Truszkowski opted out of snow removal list), 75 (admitting Quinones opted out of coat check list).)  Further, heavy cleaners must complete specialized training to qualify for certain types of overtime.  (Pls.' Counterstatement to Columbia ¶ 66.)  And individual heavy cleaners' regular shifts, vacation days, and other leaves of absence may impact their opportunities to work overtime.  (Pls.' Counterstatement to Columbia ¶¶ 68–69.)  Finally, the CBAs require that overtime be allocated by seniority—meaning that heavy cleaners with greater seniority have more opportunities for overtime.  (Lopes Aff. ¶ 30; Pls.' Counterstatement to Columbia ¶ 36; Pls.' Counterstatement to Local 241 ¶ 12.)

If an employee believes that overtime hours are being improperly distributed, the CBAs provide a two-step grievance procedure.  (Pls.' Counterstatement to Columbia ¶¶ 39, 62.) This procedure states, in relevant part, that when "any dispute [arises] with regard to the interpretation or application of any of the terms of this agreement:"

> Step 1. The employee feeling him/herself aggrieved shall discuss the grievance within five (5) days of the incident giving rise to the grievance with his/her immediate supervisor . . . [and] [s]uch immediate supervisor shall give his/her answer to said grievance within five (5) days.  Failure on the part of [Columbia] to answer a grievance within the time limits provided for shall allow [Local 241], at its option, to proceed to the next step.

> Step 2. It shall be presumed by [Columbia] that the grievance has been disposed of to the satisfaction of [Local 241] and the employee under Step 1 unless within five (5) days after the expiration of the five (5) day period referred to in Step 1 for the employee's immediate supervisor to give his/her answer, a statement of the existence of a grievance is presented in writing to the head of the department or his/her designated representative in which said employee works.

(Pls.' Counterstatement to Columbia ¶¶ 40, 62.)

The record in this case reveals a tortured history of intermittent complaints by heavy cleaners at Columbia regarding the distribution of overtime.  Neither party offers a

coherent description of Plaintiffs' grievances or Defendants' responses.  And the underlying

record is a morass of contradictory recollections and foggy memories containing significant

gaps.  Nevertheless, this Court dredged the record to reconstruct the following sequence of

events.

In August 2008, Diaz, DeLeon, Truszkowski, Morciglio, and Quinones, sent a

letter to then-Local 241 President Enzo Rodriguez requesting that he enforce the CBA overtime

rules.  (Decl. of Mary Ellen Donnelly in Supp. of Columbia's Mot. for Summ. J., ECF No. 92

("Donnelly Decl."), Ex. 12 ("August 2008 Letter").)  Apparently, Rodriguez never responded to

the August 2008 Letter.  In June 2010, at least some Plaintiffs recall sending another letter to

Rodriguez complaining that he neglected to respond to the August 2008 Letter and had failed to

correct the inequitable distribution of overtime.  (Donnelly Decl. Ex. 13 ("June 2010 Letter").)

The June 2010 Letter also asserted:

> As per the deficient completion of our August 2008 request, we
> demand that all rules and specifically [the overtime rules] of the
> CBA be enforced.  As the appropriate group in this matter, we would
> like the overtime assignment list arranged by seniority and
> classification, posted near our lockers and or clock stations by
> manner of whichever location is most visible as determined by
> ourselves at each appropriate location.  On the overtime assignment
> list, the dates of the rotation shall be clearly stated with all weeks
> divided evenly as afforded by time and seniority according to the
> CBA.

(June 2010 Letter.)

Several weeks prior to the June 2010 Letter, Diaz filed a charge with the National

Labor Relations Board ("NLRB") against Local 241 claiming that "within the past six months"

Local 241 "failed and refused to process the overtime grievance of Anicasia Diaz and other

employees, for arbitrary, discriminatory or otherwise invidious reasons."  (Pls.'

Counterstatement to Columbia ¶ 44.)  Diaz did not pursue her charge after it was transferred to

an NLRB Region outside of New York, New York.  (Pls.' Counterstatement to Columbia ¶¶ 46–47.)

On August 31, 2010, Quinones filed a charge with the NLRB alleging that Local 241 "failed and refused . . . to process a grievance on [his] behalf . . . regarding [Columbia's] violation of [Quinones'] seniority rights and related decisions to assign him overtime."  (Pls.' Counterstatement to Columbia ¶¶ 51–52; Lopes Aff. Ex. D, at 4.)  On November 23, 2010, the NLRB dismissed Quinones' charge, concluding that "the evidence fail[ed] to establish that [Local 241] violated the [NLRA]."  (Pls.' Counterstatement to Columbia ¶ 54.)

Seven years later, on August 15, 2017, Plaintiffs' counsel sent a letter to Local 241 and Columbia claiming that overtime was being improperly distributed to "relatives, friends, and allies of union officials."  (Donnelly Decl. Ex. 18 ("August 2017 Grievance").)  On August 30, 2017, Columbia responded to Plaintiffs' counsel that "the distribution of overtime is currently administered by [Local 241]."  (Donnelly Decl. ¶ 20, Ex. 19).  The record on this motion does not reflect that Local 241 responded to Plaintiffs' counsel's letter.  In October 2017, Plaintiffs' counsel, filed a grievance with Local 241 and Columbia regarding inequitable overtime distribution.  (Am. Compl., ECF No. 24, at ¶ 23; Donnelly Decl. Ex 21 ("October 2017 Grievance").)  The October 2017 Grievance stated in pertinent part: "Overtime assignments are not distributed equally . . . . Relatives and friends of union officials are given preference for overtime assignments."[2]  This time, Local 241 responded:

> Please be advised that, as you do not represent the Union, you do not have any standing under the CBA to submit a grievance to the University.  Your letter also appears to fail to recognize the proper party that should receive a grievance under the CBA, namely the employer, [Columbia].

---

[2]     The grievance also listed amounts Plaintiffs were paid for overtime during certain periods.  As Plaintiffs do not claim that Columbia failed to pay them for any time worked, these amounts are irrelevant.

(Decl. of Stuart Lichten in Opp'n to Mots. for Summ. J., ECF No. 100, ("Lichten Decl. 1"), Ex. 4.)  Simultaneously, Columbia informed Plaintiffs' counsel that:

> The University is in receipt of your letter dated October 25, 2017, along with a Local 241 Grievance Form.  Please be advised that Step 1 of the contractual grievance procedure requires that an aggrieved member discuss the grievance with their immediate supervisor within 5 days of the incident giving rise to the grievance.  As such, please advise your clients of this first step.   In addition, your correspondence was forwarded to Local 241.

(Donnelly Decl. Ex. 19.)  Days later, Plaintiffs' counsel inquired whether Local 241 would investigate the October 2017 Grievance.  Again, Local 241 failed to respond.  (Am. Compl. ¶¶ 26–27.)

After Plaintiffs filed this action in November 2017, Local 241 created an overtime complaint form.  (Pls.' Counterstatement to Columbia ¶ 86.)  In June and July 2018, Diaz, Gomez, and Truszkowski submitted overtime complaint forms regarding the distribution of overtime assignments.  (Pls.' Counterstatement to Columbia ¶ 87–89.)  Apparently, Local 241 President Alex Molina responded only to Diaz's complaint form, writing somewhat cryptically, "the Union has come up with a final change in this matter."  (Pls.' Counterstatement to Columbia ¶ 90.)

<u>DISCUSSION</u>

In essence, each individual plaintiff challenges denials of specific overtime assignments.  Plaintiffs assert that (1) Columbia breached its obligations under the CBAs by allowing head cleaners to distribute overtime to friends and relatives of Local 241 officials; (2) Plaintiffs grieved the improper distributions to Local 241; and (3) Local 241 failed to investigate, and otherwise ignored, Plaintiffs' grievances in breach of its duty of fair representation.  (Am. Compl. ¶¶ 17, 21–23, 27–31.)

I.      Legal Standards

     A.   Hybrid § 301 Claim

"[W]hen a union breaches its duty of fair representation in a grievance or arbitration proceeding, . . . an employee may bring suit against both the union and the employer. Such suit . . . is known as a hybrid § 301/fair representation claim."  Carrion v. Enter. Ass'n, 227 F.3d 29, 33 (2d Cir. 2000) (per curiam) (citations omitted).  To establish a hybrid § 301 claim, a plaintiff must show (1) "that the union breached its duty of fair representation vis-à-vis the union members," and (2) "that the employer breached a collective bargaining agreement."  White v. White Rose Food, 237 F.3d 174, 178 (2d Cir. 2001).  "[T]he [u]nion's breach is a prerequisite to consideration of the merits of plaintiff's claim against" the employer.  Young v. U.S. Postal Serv., 907 F.2d 305, 307 (2d Cir. 1990).  "If a plaintiff cannot make this [] showing, [the] hybrid section 301/duty of fair representation action fails, and neither the union nor the employer can be held liable."  Jordan v. Viacom Outdoor Grp., 475 F. Supp.2d 440, 444 (S.D.N.Y. 2007) (citing DelCostello v. Int'l Bros. of Teamsters, 462 U.S. 151, 164–65 (1983)).

A claim for breach of the duty of fair representation contains two elements.  First, Plaintiffs must show that the "conduct toward [them] is arbitrary, discriminatory, or in bad faith."  Sanozky v. Int'l Ass'n of Machinists and Aerospace Workers, 415 F.3d 279, 282 (2d Cir. 2005) (per curiam) (quoting Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 44 (1998)).  "Plaintiffs must then demonstrate a causal connection between the union's wrongful conduct and their injuries."  Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 126 (2d Cir. 1998).  Moreover, "A union's failure or refusal to pursue a grievance on its own does not constitute a breach of the duty of fair representation unless that failure or refusal may be 'fairly characterized as so far outside of a wide range of reasonableness that it is wholly irrational or arbitrary.'"  Vera

v. Saks, 424 F. Supp. 2d 694, 706 (S.D.N.Y. 2006) (citation omitted) (quoting Air Line Pilots

Ass'n, Int'l, 499 U.S. 65, 67 (1991)).  "Accordingly, to find a breach of the duty of fair

representation . . . [a court] must determine whether the [plaintiff] has plausibly alleged that: (1)

the [p]laintiff had a meritorious grievance; (2) [the defendant] was aware of the grievance; and

(3) [the defendant] acted arbitrarily in failing to process the [plaintiff's] grievance."  Thomas v.

Little Flower for Rehab. & Nursing, 793 F. Supp. 2d 544, 548 (E.D.N.Y. 2011).

Plaintiffs must also prove that Columbia breached the CBAs, all of which state

that "[a]ll overtime assignments will be distributed as equally as possible by job classification

and seniority on a rotating list."  (Pls.' Counterstatement to Columbia ¶ 56.)

B.  Article III Standing

Columbia argues that none of the Plaintiffs have standing to bring this action

under Article III of the United States Constitution.  Specifically, Columbia asserts that each

Plaintiff fails (1) to establish an injury-in-fact, and (2) to trace any injury to Columbia's conduct.

Article III jurisdiction is always an antecedent question to the merits of a case.

See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101 (1998).  This is so because

"[h]ypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes

to the same thing as an advisory opinion, disapproved by this Court from the beginning."  Steel

Co., 523 U.S. at 101 (citing Muskrat v. United States, 219 U.S. 346, 362 (1911)); see also

Hayburn's Case, 2 U.S. (2 Dall.) 408 (1792)).  "Without jurisdiction the court cannot proceed at

all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only

function remaining to the court is that of announcing the fact and dismissing the cause."  Ex

parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).

To establish standing under Article III, Plaintiffs must each (1) suffer a concrete, particularized injury (i.e., an "injury-in-fact"), (2) that is fairly traceable to the challenged conduct of the defendant, and (3) is likely to be redressed by a favorable judicial decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  At summary judgment, a party invoking federal jurisdiction "can no longer rest on . . . 'mere allegations,' but must set forth by affidavit or other evidence 'specific facts'" establishing standing.  Clapper v. Amnesty Int'l. USA, 568 U.S. 398, 412 (2013) (quoting Lujan, 504 U.S. at 561).

### C.  Summary Judgment

The elements of standing are an "indispensable" part of a plaintiff's case, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."  Lujan, 504 U.S. at 561.  Because this case is at the summary judgment stage, the merits of the standing issue must be subjected to the same standards as any other issue at summary judgment.

Summary judgment is proper only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Scott v. Harris, 550 U.S. 372, 380 (2007) (quotation marks omitted).  This Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists." Rodriguez v. City of New York, 72 F.3d 1051, 1060–61 (2d Cir. 1995). Where the non-movant bears the burden of proof at trial, the movant may show prima facie entitlement to summary judgment by pointing to evidence that negates the non-movant's claims or by pointing to a lack of evidence for the trier of fact on an essential element of the non-movant's claim. CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013). If the movant makes this showing, the burden shifts to the non-movant to "point to record evidence creating a genuine issue of material fact." Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006).

"In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party." Flanigan v. Gen. Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001). However, "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation and alterations omitted).

II.  Application

    A.  Injury-In-Fact

To determine whether Plaintiffs have demonstrated an injury-in-fact "[a] court must determine (1) whether the asserted injury is 'concrete,' and (2) whether it is 'actual or imminent.'" MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy, 861 F.3d 40, 45 (2d Cir. 2017), as amended (Aug. 2, 2017) (citations omitted). First, a plaintiff must demonstrate that "the alleged injury is 'particularized' to the plaintiff, rather than 'conjectural or hypothetical.'"

MGM Resorts, 861 F.3d at 45.  Next, a plaintiff must demonstrate "that the alleged injury is, if not actual, at least 'certainly impending' and 'not too speculative.'"  MGM Resorts, 861 F.3d at 45.

### 1.  Payroll Records Generally

Plaintiffs argue that Columbia's payroll records can be used to demonstrate both their injuries-in-fact for standing purposes and their entitlement to damages.  (Tr. of Oral Arg. ("Tr.") at 25:11–15.)  Specifically, Plaintiffs theorize that the difference between the average number of overtime hours worked by all heavy cleaners at Columbia and the number of overtime hours worked by each Plaintiff establishes an injury-in-fact.  And multiplying that numerical difference by a heavy cleaner's rate of overtime compensation establishes the damages to which each Plaintiff is entitled.  But the Plaintiffs' methodology is fundamentally flawed.  And even were it accepted, the record is bereft of supporting evidence.

To begin, Plaintiffs' counsel did not supply this Court with Columbia's actual payroll records.  Instead, counsel offers a selective analysis of those records.  (See Decl. of Stuart Lichten, ECF No. 108 ("Lichten Decl. No. 2").)  Counsel's analysis is divided into two discrete time periods: May 7, 2017–March 25, 2018 and March 26–December 31, 2018.[3]  For each of those time periods, counsel lists the number of overtime hours worked by each Plaintiff and certain other individuals mentioned in Plaintiffs' briefing (purportedly friends and family of Local 241 officials).

Puzzlingly, counsel's analysis for the May 7, 2017–March 25, 2018 time period omits the average number of overtime hours worked by all heavy cleaners at Columbia.  As a

---

[3]     This Court discerns no rational for dividing the analysis into two separate time periods.  Moreover, at oral argument, Plaintiffs' counsel acknowledged that Plaintiffs have no back-pay claim for any day prior to May 17, 2017.

result—even accepting Plaintiffs' erroneous assumption that the injury for each plaintiff can be measured against the average number of overtime hours worked—it is impossible to conclude whether any Plaintiff suffered an injury during the May 7, 2017–March 25, 2018 time period. And, in any event, this Court cannot calculate such an average as counsel only lists the overtime hours worked by a subset (Plaintiffs and alleged friends and family of Local 241 officials) of all heavy cleaners at Columbia.

While counsel's analysis for the March 26–December 31, 2018 time period includes the average number of overtime hours worked by all heavy cleaners at Columbia, there are significant flaws with Plaintiffs' method that make it too blunt an instrument to establish an injury-in-fact. More specifically, Plaintiffs' bare reliance on an average overlooks a number of factors that affect a heavy cleaner's overtime earnings.

As an initial matter, Plaintiffs are not entitled to equal overtime under the CBAs. (See Pls.' Counterstatement to Local 241 ¶ 12 (2008–2013 CBA); ECF No. 114-1 (2013–2016 CBA); Pls.' Counterstatement to Columbia ¶ 56 (2016–2020 CBA).) Rather, the CBAs entitle heavy cleaners to overtime "distributed as equally as possible by job classification and seniority on a rotating list." (Pls.' Counterstatement to Columbia ¶ 56.) The fact that a heavy cleaner works a below-average number of overtime hours is, therefore, not indicative of whether that heavy cleaner was denied overtime hours improperly or otherwise suffered an injury-in-fact.

Further, averaging overtime hours worked among all heavy cleaners at Columbia fails to account for the numerous legitimate reasons that determine opportunities for overtime work. For example, overtime opportunities vary depending on a heavy cleaner's seniority, building assignment, shift, vacations and absences, and the elective overtime lists for which they volunteer. In particular, Plaintiffs do not account for their seniority or the seniority of the alleged

friends and family of Local 241 officials, much less the seniority of other heavy cleaners.  Nor do Plaintiffs account for vacations or other absences taken by themselves, the alleged friends and family of Local 241 officials, or other heavy cleaners.

Truszkowski offers a paradigm of why comparisons of overtime hours between any two heavy cleaners are not indicative of wrongfully denied overtime.  In her declaration, Truszkowski avers that during the week of July 31, 2017, she worked fewer overtime hours than two other heavy cleaners.  (Truszkowski Decl. ¶ 6.)  But Columbia's time records show that Truszkowski was "out" one day that week when the two other heavy cleaners each picked up six hours of overtime.  (See Lichten Decl. No. 1 Ex. 2, at 2.)  In failing to account for these variables, Plaintiffs' method does nothing to demonstrate either (1) the overtime hours to which each Plaintiff was entitled, or (2) the overtime hours that each was denied.

Finally, merely using averages or statistics to establish an injury-in-fact requirement for standing has been rejected by at least one judge in this District.  See In re Whole Foods Mkt. Group, Inc. Overcharging Litig., 397 F. Supp. 3d 406 (S.D.N.Y. 2019).  In Whole Foods, the New York Department of Consumer Affairs released a report stating that Whole Foods frequently overcharged consumers by assigning exaggerated weights to pre-packaged foods priced by weight.  397 F. Supp. 3d at 408.  The plaintiff there claimed that he purchased such products frequently and was overcharged.  Whole Foods, 397 F. Supp. 3d at 408.  But he was unable to produce any receipts of his allegedly overpriced purchases.  Whole Foods, 397 F. Supp. 3d at 408.  Instead, plaintiff relied on (1) statistics from the Department of Consumer Affairs, and (2) evidence related to Whole Foods' general practices in weighing pre-packaged items.  Whole Foods, 397 F. Supp. 3d at 419.  The court rejected the use of statistical evidence,

holding that it failed to establish an injury-in-fact for standing purposes because "some particularized proof is necessary."  Whole Foods, 397 F. Supp. 3d at 422–23.

Here, as in Whole Foods, the payroll records summarized by Plaintiffs' counsel establish only that different heavy cleaners received different amounts of overtime.  Critically, they fail to show any injury particular to an individual plaintiff.  Even if the records generally indicated an injury, they fail to show which, if any, overtime hours were denied to Plaintiffs.  And because heavy cleaners were not entitled to an equal number of overtime hours, it is impossible to determine any injury to Plaintiffs by comparing Plaintiffs' overtime hours to the average overtime hours worked by heavy cleaners.  In short, the payroll records fail to establish that Plaintiffs suffered an injury-in-fact.  Having rejected Plaintiffs' methodology, this Court focuses on the evidence offered by each Plaintiff independent of Plaintiffs' analysis of the payroll records.

## 2.  Diaz

In her declaration in opposition to the motions for summary judgment, Diaz avers that over the course of "many weeks," she "received either fewer overtime assignments, or less popular assignments, while others who are friends or relatives of well-connected employees enjoyed abundant overtime of their choosing."[4]  (Decl. of Anicasia Diaz, ECF No. 111, at ¶ 3.)  This vague assertion is insufficient to establish an injury-in-fact.  And Diaz points to no other evidence regarding overtime assignments for which she was qualified and applied but was not selected.  Moreover, even if this Court allowed Plaintiffs' payroll records analysis as evidence of injury-in-fact, Plaintiffs' analysis reflects that Diaz worked 318 more overtime hours than the

---

[4]     Plaintiffs have neither pleaded nor produced any evidence that the CBAs entitled them to overtime of their choosing or more-desirable assignments.  As such, even if Diaz adduced evidence that she was assigned less-desirable shifts, she would still fail to show an injury-in-fact.

average heavy cleaner in the March 26–December 31, 2018 time period.  (See Decl. of Stuart

Lichten, ECF No. 108 ("Lichten Decl. 2"), at ¶¶ 7, 9.)  Indeed, at oral argument, Plaintiffs'

counsel conceded that Diaz has no claim for back pay damages.  (Tr. at 26:7–11.)  Without a

claim for back pay, Diaz cannot show an injury in fact.  Counsel went on to argue that Diaz

"might" have claims for emotional distress as a result of being assigned less-desirable overtime

work and might be entitled to injunctive relief.  (Tr. at 26:7–11.)  But the CBAs do not entitle an

employee to pick and choose desirable overtime work.  In determining standing at the summary

judgment stage, the time for "might" or "may" is over.

> ### 3.  DeLeon

DeLeon offers no evidence that she qualified for overtime assignments but did not

receive them.  Rather, the record establishes that DeLeon turned down overtime assignments that

required her to work outside her assigned building at Columbia.  (Farkas Decl. Ex. E, ("DeLeon

Dep."), at 20:25–21:7 ("Q: Are you offered overtime in those other buildings? A: Sometimes. Q:

But you don't take it because you don't want to work anywhere other than Mudd on overtime; is

that correct? A: Yes, that is correct.").)  When heavy cleaners elect not to sign up for overtime

assignments outside of their assigned buildings, the opportunities for overtime are necessarily

diminished.  Further, DeLeon limited her overtime opportunities by declining to sign up on five

of the six overtime lists. (DeLeon Dep., at 20:25–21:7.)

> ### 4.  Gomez

In contrast to the other Plaintiffs, Gomez points to a single instance—January 13,

2020—when she claims she was denied overtime.  (Farkas Decl. Ex. F ("Gomez Dep."), at

39:14–40:3.)  In that instance, however, the overtime assignment conflicted with Gomez's

regular shift.  (Gomez Dep., at 41:20–42:6.)  While Gomez believed the assignment could have

16

been worked at a time that did not conflict with her regular shift, she also acknowledged that she did not know whether Columbia management required that overtime assignment to be performed during specific hours.  (Gomez Dep., at 42:7–12, 43:2–5, 44:2–5.)  Despite eleven months of discovery, Gomez did not unearth any evidence to buttress this claim.  Accordingly, a jury could only speculate about whether Gomez was denied the opportunity to earn this overtime after her regular shift.  Such a hypothetical injury is insufficient to create standing under Article III.  See MGM Resorts, 861 F.3d at 45 (alleged injury must be "'particularized' to plaintiff, rather than 'conjectural or hypothetical'" (citations omitted)).  Further, even accepting, for the sake of argument, Plaintiffs' payroll records analysis, Gomez, like Diaz, worked 106 more overtime hours than the average heavy cleaner in the March 26–December 31, 2018 time period.

### 5. Morciglio

Columbia's payroll records show that Morciglio worked twenty-six overtime hours between May 7, 2017 and her retirement in early February 2018.  Morciglio offers no evidence, anecdotal or otherwise, showing that she was denied any specific overtime hours. Instead, Morciglio relies entirely on her counsel's analysis of Columbia's payroll records.  But, even if this Court accepted counsel's analysis, it is impossible to determine whether Morciglio suffered an injury utilizing Plaintiffs' counsel's methodology because the average number of overtime hours worked by all heavy cleaners during this time period cannot be calculated.

### 6. Truszkowski

Truszkowski avers that "[w]hile [she] worked at Columbia, [she] was frequently denied overtime assignments that should have been [hers] under the seniority system."  (Decl. of Mariola Truszkowski, ECF No. 109 ("Truszkowski Decl."), at ¶ 5.  Counsel's analysis of Columbia's payroll records shows that Truszkowski worked 100 hours of overtime during the

May 5, 2017–March 25, 2018 time period and 100 hours of overtime during the March 26–

December 31, 2018 time period. (Lichten Decl. 2 ¶¶ 7, 9.).  Again, the lack of an average number

of overtime hours worked by all heavy cleaners from the May 5, 2017–March 25, 2018 time

period makes it impossible to determine whether Truszkowski suffered an injury under

Plaintiffs' methodology.  Further, Truszkowski only signed up for two of the six overtime lists—

the overtime list for her building and for coat check.  (Truszkowski Dep., at 12:17–21.)  Having

signed up for only two overtime lists, it was inevitable that she would work fewer overtime hours

than heavy cleaners who were more flexible and signed up for any available overtime.

7. <u>Quinones</u>

Quinones claims that he received few overtime assignments, while friends and

relatives of well-connected employees "enjoyed abundant overtime."  (Decl. of Pedro Quinones,

ECF No. 110 ("Quinones Decl."), at ¶ 5.  Counsel's analysis of Columbia's payroll records show

that Quinones worked 78 hours of overtime during the May 5, 2017–March 25, 2018 time period

and 78 hours of overtime during the March 26–December 31, 2018 time period.  (Lichten Decl. 2

¶¶ 7, 9.)  But these figures, standing alone, are meaningless because nothing in the record

establishes average number of overtime hours worked by all heavy cleaners from May 5, 2017–

March 25, 2018 time period.  And, while Quinones worked 131 fewer overtime hours than the

average heavy cleaner during the March 26–December 31, 2018 time period, he did not sign up

for three of the six overtime lists. (Farkas Decl. Ex. I, Quinones Dep., ECF No. 87-9 ("Quinones

Dep."), at 14:6–11; 19:15–24; 22:12–23:10.  Significantly, Quinones also refused overtime

assignments for which he had signed up when he determined the number of overtime hours

allocated were insufficient to complete the assignment.  Quinones Dep., at 14:6–11; 19:15–24;

22:12–23:10.

At deposition, Quinones testified that "maybe twice" he was offered two hours of overtime, declined to accept it, and then learned that the same assignment was given to another heavy cleaner who received more than two hours of overtime to complete the job. (Quinones Dep., at 51:13–19.) One such incident occurred around Columbia's May 2019 commencement exercises. (Quinones Dep., at 51:20–52:3.) However, Quinones offers no particularized evidence regarding this claim, such as who the heavy cleaner was, or whether, in fact, the heavy cleaner who completed the job actually received more than two hours. During discovery, Plaintiffs made no effort to uncover evidence to support this claim and a jury could only speculate as to whether Quinones suffered an injury. See MGM Resorts, 861 F.3d at 45 (alleged injury must be "particularized to plaintiff, rather than conjectural or hypothetical" (quotation marks omitted)).

B.  Causation

Columbia next argues that, even if any of the Plaintiffs established an injury, it cannot be traced to Columbia's conduct. Columbia avers that a past practice between the parties, allowing Local 241-designated employees to distribute overtime hours to heavy cleaners, relieves Columbia of the obligation to see that overtime hours were being distributed as equally as possible. (Tr. at 10:17–11:8.) Plaintiffs counter that the unambiguous language of the CBAs requires Columbia to ensure overtime hours are "distributed as equally as possible by job classification and seniority on a rotating list." (Opp'n, at 21.) Columbia's argument is difficult to square with repeated renewals of the CBAs, each of which included the identical provision regarding the distribution of overtime, despite the parties' practice to the contrary. However, because this Court dismisses Plaintiffs' claims based on the failure to establish an injury-in-fact,

it need not definitively rule on the question of Columbia's obligations under the CBAs, especially because the parties did not brief this issue.

III.    Merits

While Columbia seeks dismissal on standing grounds, both Defendants also seek summary judgment on the merits.  In reviewing whether Plaintiffs have established a material issue of fact regarding an injury-in-fact, the merits and Article III standing analysis merge.  See Whole Foods, 397 F. Supp. 3d at 429.  Thus, Plaintiffs' failure to establish an injury-in-fact entitles Defendants to prevail on the merits as well as standing.  But, because Article III standing is jurisdictional, this Court must dismiss Plaintiffs' claims for lack of Article III standing rather than on the merits.  See Carter v. HealthPort Techs., LLC, 822 F.3d 47, 54–55 (2d Cir. 2016) (Dismissal for lack of Article III standing "is one for lack of subject matter jurisdiction; and, without jurisdiction, the district court lacks the power to adjudicate the merits of the case." (citations omitted)).

There is no doubt, however, that if standing was established, this Court would enter summary judgment in favor of Defendants for Plaintiffs' failure to establish a critical component of their hybrid § 301 claim, namely that overtime hours were distributed in a manner that violated the CBAs.[5]  Plaintiffs claim that the CBAs were breached because overtime hours were allocated to friends and family of Local 241 officials rather than "as equally as possible by job classification and seniority on a rotating list."  (See Pls.' Counterstatement to Local 241 ¶ 12 (2008–2013 CBA); ECF No. 114-1 (2013–2016 CBA); Pls.' Counterstatement to Columbia ¶ 56

---

[5]    In deciding Columbia's earlier motion to dismiss, this Court "construe[d] Plaintiffs' claim concerning Local 241's inequitable distribution of overtime as a separate and independent claim for breach of the duty of fair representation asserted only against Local 241."  Diaz v. Loc. No. 241, Transp. Workers Union of Am., Univ. Div., 2019 WL 3765924, at *7 (S.D.N.Y. Aug. 9, 2019) (emphasis in original).  Neither Plaintiffs nor Local 241 addressed the merits of such a claim on summary judgment.  In any event, the DFR claim is dismissed for lack of standing for the same reasons that the hybrid § 301 claim is dismissed.

(2016–2020 CBA).)  But the failure to adduce evidence that any Plaintiff was wrongly denied an overtime assignment likewise fails to provide proof that any overtime assignments were improperly distributed in violation of the CBAs.

IV.      Final Considerations

            While this Court must dismiss without prejudice because the issue of standing is jurisdictional, Carter, 822 F.3d at 55, any motion to amend the pleading at this stage would be both futile and prejudicial to Defendants.  See, e.g., In re UBS ERISA Litig., 2014 WL 4812387, at *8–9 (S.D.N.Y. Sept. 29, 2014) (rejecting motion to amend following dismissal for lack of standing because (1) such an amendment would be futile, and (2) plaintiffs had ample opportunities to amend to include allegations of individualized harm and declined to do so); see also Ansam Assocs., Inc. v. Cola Petroleum, Ltd., 760 F.2d 442, 446 (2d Cir. 1985) (affirming denial of motion to amend complaint following close of discovery); Magnuson v. Newman, 2013 WL 5942338, at *2 (S.D.N.Y. Nov. 6, 2013) ("Courts have typically found amendments to be prejudicial in circumstances where discovery has been completed.").

            Nor should Plaintiffs attempt to relitigate standing through a motion for reconsideration.  The parties conducted eleven months of discovery.  And while the record on this motion is disjointed and at times plainly confusing, a dismissal for lack of standing is not an invitation to engage in a dialogue with this Court in which Plaintiffs attempt to plug the holes in the record with facts that should have been proffered in the first instance.  See Knife Rts., Inc. v. Vance, 2013 WL 6182921, at *1 (S.D.N.Y. Nov. 20, 2013) (denying motion for reconsideration following dismissal for lack of standing because "[t]heir motion [] evinces an intent to 'plug [] the gaps of [their] lost motion' by inserting new allegations related to standing—exactly the type of situation for which reconsideration is not designed." (citation omitted)).

Finally, the principles of <u>res judicata</u> apply to this Court's finding that Plaintiffs lack standing.  Absent a showing of <u>new</u> facts, Plaintiffs are precluded from re-litigating the standing issue.  <u>See</u> <u>Insurance Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee</u>, 456 U.S. 694, 702 n.9 (1982) ("It has long been the rule that principles of <u>res judicata</u> apply to jurisdictional determinations—both subject matter and personal."); <u>Stone v. Williams</u>, 970 F.2d 1043, 1057 (2d Cir. 1992) ("[P]rinciples of preclusion apply equally to jurisdictional matters."); <u>Wells Fargo Bank, N.A. v. Ullah</u>, 2014 WL 2117243, at *3 (S.D.N.Y. May 21, 2014) ("A party without standing may later acquire it.  But this requires some change in circumstances.  Once a court determines that a given set of circumstances does not constitute a case or controversy, that decision is final."  (citations omitted)).

<u>CONCLUSION</u>

For the forgoing reasons, Plaintiffs' claims are dismissed for lack of standing. Because the issue of standing is jurisdictional, the dismissal is without prejudice.  <u>Carter</u>, 822 F.3d at 55.  The Clerk of the Court is directed to terminate the motions pending at ECF Nos. 84 and 88 and to mark this case as closed.

Dated: March 19, 2021
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.